IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | : | |
|---|---|---|
| ESTATE OF JANET A. FISHER | : | |
| | : | |
| v. | : | |
| | : | Civil Action No. CCB-10-792 |
| PNC BANK, N.A., et al. | : | |
| | : | |

...o0o...

## MEMORANDUM

Pending before this court is a motion to dismiss filed by the defendants, PNC Bank N.A. ("PNC Bank"), Sinai Hospital of Baltimore, Inc., the Johns Hopkins Hospital, the Johns Hopkins University, and the Peabody Institute of the Johns Hopkins. The plaintiff, Estate of Janet A. Fisher (the "Fisher Estate"), by and through its special administrators, Karla J. Ott and Sherie A. Sasso, have sued the defendants, seeking declaratory and injunctive relief. The issues in this case have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons stated below, the motion to dismiss will be granted.

## BACKGROUND

This case involves the construction of the Last Will and Testament of Charles R. Austrian (the "Austrian will").[1] Dr. Charles Austrian ("Charles") was a prominent Baltimore physician

---

[1] The plaintiff attached a copy of the will to its complaint and incorporated it therein by reference. (*See* Compl. ¶15, Ex. A). "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Moreover, a court considering a motion to dismiss may rely on any document that is "integral to and explicitly relied on in the complaint" without converting the motion to one for summary judgment, regardless of whether the document is attached to the complaint, so long as the authenticity of the document is not challenged. *CACI Int'l, Inc. v. St. Paul Fire and Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009). Although the charitable beneficiary defendants attached to their motion to dismiss a copy of the will different from the copy attached to the complaint (*see* Charitable Beneficiaries' Mem. Ex. 1), the parties agree that the language of the will appearing in both versions is identical; in other words, there is no dispute as to the authenticity of the copy of the will attached to the complaint. To the extent the parties dispute which version the court should consider, the dispute concerns the completeness of handwritten notes in the margins. For the reasons discussed below, the court concludes that the language of the will clearly supports the defendants' interpretation and thus any handwritten marginalia is immaterial. Therefore, the court will consider the language of the will for the purposes of the defendants' motions to dismiss.

who was married to Florence Hochschild Austrian ("Florence"). Charles and Florence had two children, Robert and Janet. Robert became a physician. Janet, who was born in Baltimore on January 17, 1918, earned a Ph.D. in economics from Columbia University, married a sociology professor named Burton R. Fisher, and settled in Madison, Wisconsin, where she taught economics at the University of Wisconsin for many years.

Charles Austrian executed his will on November 12, 1955.[2] The 13-page will specifically bequeathed personal property to his wife (if she survived him) and $5,000 to his secretary. (Compl. Ex. A, arts. 2-3.) The "rest, residue and remainder" of his estate, after payment of costs, would be held in trust. (*Id.* art. 4.)[3] Mercantile-Safe Deposit and Trust Company ("Mercantile," later succeeded by PNC Bank) was designated as trustee, along with Florence and Robert, of the trusts created by Article 4 of the will. Under the terms of the will, the income from the trust was to be paid to Florence, Charles's wife, during her life. (*Id.* art. 4(B).) Upon the death of both Charles and Florence, the corpus was to be divided in half (*id.* art. 4(C)), and each half held in trust according to the following terms:

> In trust, as to each part so made for each of my two children, to pay the net income therefrom to the child of mine for whom it has been created, as long as such child shall live; and at the time of the death of such child who survives my wife and myself, or after the death of my wife and myself if such child does not survive my wife or myself, to give, absolutely, the corpus of the said part, as constituted at such time, to the issue living at such time, of such child of mine, per stirpes and not per capita, absolutely; but if there are no such issue of such child then living, then to pay the net income from such part to such other child of mine, as long as such child shall live; but if such other child of mine shall not be alive at such time (or if such other child of mine shall be alive at such time, then, at his death), to give, absolutely, the corpus of such part to the issue, of such other child of mine, living at the time provided above for the distribution of the corpus, per stirpes and not per capita, absolutely; otherwise to my issue living at such time, per

---

[2] The will was witnessed by two individuals: Rosa E. Nicholson, who is identified in Article Third of the Will as the testator's "secretary for many years." (Compl. Ex. A, at 12.) The other witness is Joseph Bernstein, a lawyer with the Baltimore law firm then known as Frank, Bernstein, Gutberlet & Conaway. As far as the parties know, both witnesses are deceased.

[3] The Austrian Will labels the articles as First, Second, etc. For ease of reference, the court will refer to the articles by numerals, *i.e.*, as 1, 2, etc.

2

stirpes and not per capita, absolutely; but if there are no such issue of mine then living, then share and share alike, absolutely, to the following: -- Sinai Hospital of Baltimore, Inc., The Johns Hopkins Hospital, The Johns Hopkins University, and The Peabody Institute of the City of Baltimore. Payments of net income provided for by this Paragraph Fourth D shall be made at least as often as quarterly per annum, subject to the provisions of Paragraph Fourth E hereof.

(*Id.* art. 4(D).) The will also permitted the trustees to withhold and accumulate trust income if, in their "sole discretion," they were to deem such action "necessary or advisable for the support, maintenance, general welfare, or education of my wife and/or any such person [for whom any part of the trust estate is then currently held in trust]." (*Id.* art. 4(E).)

Charles died on July 16, 1956, and his will was admitted to probate in Baltimore City. During Florence's life, Mercantile administered two trust accounts, one that paid net income to her and another that held income accumulated during Mrs. Austrian's life. Florence died on December 13, 1979, after which Mercantile administered four trust accounts, two for the benefit of Robert and two for the benefit of Janet. One trust for each child provided net income to the child during his or her life; the other represented the accumulated income share for the child of the net income withheld from Florence Austrian during her lifetime. Robert and Janet became the beneficiary of the main trust and the accumulation trust in their respective halves of the Austrian estate.

Robert Austrian married late in life and died on March 25, 2007 without having produced issue. Janet Fisher died on on October 5, 2009, at the age of 91, also without issue. Janet's Last Will and Testament designated the Janet A. Fisher 2003 Revocable Trust (the "Fisher Trust"), which had been created on or about September 13, 2004, as the beneficiary of her residuary estate. The terms of the Fisher Trust provide that as of Janet's death, after making certain specific distributions of personal property and cash, the trustees are to distribute the balance of the trust property equally to seven charities: the American Civil Liberties Union Foundation,

3

Amnesty International USA, CARE, the United Jewish Appeal–Federation of Jewish Philanthropies of New York, the American Society for Technion, the NAACP Legal Defense and Education Fund, Inc., and the Planned Parenthood Federation of America, Inc. (the "Fisher charities").

Following Janet Fisher's death, the trustees of the Fisher Trust raised with PNC Bank their belief that upon Robert's death, the corpus of the trust accounts that had been held for his benefit ("Robert's trusts") should have been distributed to Janet, as the sole issue of Charles then living. Under that interpretation of the Austrian will, the corpus of Robert's trust accounts, after being distributed to Janet's estate, would then be distributed to the seven Fisher charities according to the terms of the Fisher Trust. PNC disagreed, and believed that upon Robert's death, the corpus of Robert's trust was required to be distributed to the charities named as contingent beneficiaries in the Austrian Will, namely Sinai Hospital, Johns Hopkins Hospital, Johns Hopkins University, and The Peabody Institute (collectively, the "Austrian charities").

In light of this disagreement about the proper interpretation of critical provisions of the Austrian Will, Ms. Ott and Ms. Sasso obtained appointments as special administrators of Janet Fisher's estate and filed this lawsuit on behalf of the estate. They seek a declaration that the corpus of Robert's trust accounts should be distributed to the Fisher Estate, an injunction ordering PNC Bank to distribute the trust accounts according to this court's declaratory judgment, as well as an order granting the plaintiff attorney's fees and costs to be paid from the corpus of the Austrian Trusts. The defendants have moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that dismissal is appropriate because "[n]o reasonable construction of the Austrian Will provides for the corpus of the trust accounts at issue to pass to Janet A. Fisher or her estate." (Motion to Dismiss by Sinai Hospital et al. at 1-2.)

## **STANDARD OF REVIEW**

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." *Id.* (internal quotation marks and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Moreover, the same pleading standards that apply in other civil actions govern proceedings under the Declaratory Judgment Act. Thus "in seeking a declaratory judgment—just as in seeking any other remedy—

5

a plaintiff must state a claim upon which relief can be granted." *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 993 (D. Md. 2002).

## **ANALYSIS**

The interpretive question before this court turns on the meaning of three words: "at such time." Those words appear in Article 4(D) of Charles Austrian's will (Compl. Ex. A), and determining their meaning requires a clause-by-clause review of that article. The preceding article, Article 4(C), requires that upon the death of Charles's wife—which occurred on December 13, 1979—the corpus of the estate would be divided into two equal parts, one for the benefit of Robert and the other for the benefit of Janet. Article 4(D), which has six substantive clauses, sets forth the terms that govern those two trusts.[4]

*Clause 1.* The first clause requires that the corpus of each trust was to be held "[i]n trust, as to each part so made for each of my two children, to pay the net income therefrom to the child of mine for whom it has been created, as long as such child shall live." In accordance with this clause, Mercantile created four trust accounts after Florence's death. Two accounts provided net income for life to Robert and Janet respectively, and the other two held the accumulated share for Robert and Janet of the net income withheld from Florence Austrian during her lifetime.

*Clause 2.* The next clause governs the distribution of the corpus of those trusts at the time of the death of either Robert or Janet, if he or she were to die with issue:

> and *at the time of the death of such child who survives my wife and myself*, or after the death of my wife and myself if such child does not survive my wife or myself, to give, absolutely, the corpus of the said part, as constituted at such time, *to the issue living at such time, of such child of mine*, per stirpes and not per capita, absolutely;

---

[4] The last and seventh clause sets forth a payment schedule: "Payments of net income provided for by this Paragraph Fourth D shall be made at least as often as quarterly per annum, subject to the provisions of Paragraph Fourth E hereof."

6

(emphasis added). Robert was the first child to die, in 2007. Because he died without issue, this clause did not take effect.

*Clause 3.* The next two clauses address the scenario in which the first child who survives the parents would die without issue. Clause 3 provides:

> but if there are no such issue of such child then living, then to *pay the net income* from such part *to such other child of mine*, as long as such child shall live;

(emphasis added). Under this clause, upon Robert's death without issue in 2007, Janet, as the surviving child, began receiving the net income from Robert's two trusts.

*Clause 4.* The next clause provides that if the first child to die were to die without issue (as occurred when Robert died childless), then upon the death of the second child to die, the corpus of the trusts of the first child would pass to the issue of the second child, if any such issue were to exist:

> but if such other child of mine shall not be alive at such time (or if such other child of mine shall be alive at such time, then, at his death), to give, absolutely, the corpus of such part to the issue, of such other child of mine, living at the time provided above for the distribution of the corpus, per stirpes and not per capita, absolutely;

(emphasis added). Janet died childless in 2009. Accordingly, this clause did not take effect.

*Clause 5.* The will then provides, "otherwise to my issue living ***at such time***, per stirpes and not per capita, absolutely" (emphasis added). This case turns on the interpretation of this clause, which the parties call the "catch-all clause." The plaintiff argues that the phrase "at such time" means "after the deaths of Florence and either of the children." (Pl.'s Opp'n. at 12.) This would mean that, in effect, "at such time" refers to when Robert died, because he was the first child to die. Accordingly, at the time of Robert's death, Janet—as Charles's only remaining "issue"—was entitled to take the corpus of the trust accounts from which Robert had received income during his life. The defendants, on the other hand, argue that the phrase refers to the

7

time of the *second* child's death, assuming both children were to survive their mother. Under that interpretation, the clause never took effect, because Janet was the second to die, and at the time of Janet's death, Charles had no issue—the bloodline had run out; accordingly, the disposition of the corpus of the Robert Austrian trust accounts requires looking to the last substantive clause of Article 4.

*Clause 6.* The last clause provides:

> but *if there are no such issue of mine then living*, then share and share alike, absolutely, to the following: -- Sinai Hospital of Baltimore, Inc., The Johns Hopkins Hospital, The Johns Hopkins University, and The Peabody Institute of the City of Baltimore.

Thus under the defendants' interpretation, these charities (the Austrian charities) are entitled to receive the corpus of the trust accounts from which Robert received income during his life.

Charles Austrian executed his will in Maryland and was a resident of Maryland, and his will was admitted to probate in Maryland. Accordingly, the construction and interpretation of the will is governed by Maryland law. *See Geier v. Mercantile-Safe Deposit & Trust Co.*, 328 A.2d 311, 318 (1974). In interpreting a will under Maryland law, the "paramount concern of the court is to ascertain and effectuate the testator's expressed intent." *Pfeufer v. Cyphers*, 919 A.2d 641, 649 (Md. 2007) (quoting *Emmert v. Hearn*, 522 A.2d 377, 379 (1987)). "[T]he search is not for the testator's 'presumed [intention] but for his *expressed intention*.'" *Id.* (citing *LeRoy v. Kirk*, 277 A.2d 611, 613 (1971)) (emphasis in original). "Generally, that intent is gathered from the four corners of the will, with the words of the will given their plain meaning and import." *Id.* (citations and alterations omitted). "[E]xtrinsic evidence should not be admitted to show that the testator meant something different from what his language imports. . . . What he meant to say must be gathered from what he did say." *Emmert*, 522 A.2d at 380 (citing *Fersinger v. Martin*, 183 Md. 135, 138, 36 A.2d 716 (1944)). Moreover, when a testator's general intent conflicts

with "minor discrepancies, omissions, or contradictions," the testator's "general intent prevails." *Mercantile-Safe Deposit and Trust Co. v. Mercantile-Safe Deposit and Trust Company*, 228 A.2d 289, 292 (1967).

Charles Austrian's general intent, as expressed through his will, was to provide income for life to his wife and, upon her death, income for life to his two children. If he were to have grandchildren or other issue, he wished to distribute the corpus of his estate to them. The question here is how Charles wished the corpus of his estate to pass in the event neither Robert nor Janet had children. Specifically, the question is whether, assuming both children would survive Florence, upon the death of the first of his children to die ("C1"), if Charles's surviving child ("C2") did not have children living at that time, he intended the corpus of C1's trust to (1) pass to C2, as the plaintiff argues, or (2) remain in trust, and in the event C2 died without issue, pass to the charitable beneficiaries designated in Charles's will, as the defendants argue. For the reasons that follow, the court holds that the defendants' proposed construction is the one closest to Charles's expressed intent.

First, the defendants' interpretation maintains a chronological order among the six clauses of Article 4. Clause 1 provides instructions for upon Florence's death, instructing that trusts be created for each of his children. The next two clauses address what should happen upon C1's death, in the event C1 dies with issue (clause 2), or if C1 dies without issue (clause 3). Thus clause 3 provided specific instructions for exactly the state of affairs as of Robert's death: Janet would acquire a life estate in the corpus of Robert's half of the estate, and thus would receive income from those trust accounts during her life. Clause 4 continues chronologically and describes two possible events, which occur at two distinct times. The first possibility—which, like clauses 2 and 3, also addresses what should happen at the death of the first child to survive

9

both parents—is that if C2 is not alive at the time of C1's death (such as if C2 died before Charles and/or Florence), the corpus of C1's trusts should be distributed to C2's issue, if any are living. The second possibility moves on to the time of C2's death, and provides that at C2's death, if C2 has issue, the corpus of C1's trust would pass to those issue. Only under the defendants' construction does the chronological progression continue. Under that construction, clause 5 provides further instructions for C2's death: if C2 dies without producing issue, the corpus of C1's trust should go to "my issue living [at the time of C2's death]." Under the plaintiff's construction, in contrast, clause 5 would refer back in time to address the moment addressed by clauses 2 and 3, namely the death of C1. This interpretation would disrupt the time progression of Article 4(D). Absent a clearly expressed intention for clause 5 to disrupt the otherwise chronological progression, the court will presume that Charles intended clause 5 to progress chronologically. When the chronology is maintained, the phrase "at such time" refers to the death of C2, and clause 5 exists to ensure that, if both children die childless, any other issue of Charles (e.g., if Charles were to have had a child after he executed the will, whether by birth or adoption, a possibility the plaintiff acknowledges (*see* Pl.'s Opp'n at 14, 12 n.6)) would have priority over the charitable beneficiaries to the corpus of C1's trust.[5]

Second, clause 4 expressly anticipates a scenario in which both children would survive the parents, Robert would die childless, and Janet would survive Robert. In that scenario, clause 4 specifically instructs that if Janet were to die with issue, the corpus of Robert's trust should go

---

[5] Indeed, the plaintiff acknowledges the possibility that Charles could have produced issue who would be living at the time his last child died, even if his children were to die childless. (*See* Pl.'s Opp'n at 12 n.6 ("Of course, the term could have included the testator's issue other than Robert or Janet (or their issue).").) The plaintiff dismisses that possibility, however, by arguing that "there is no other indication in the Will that such other issue existed or were reasonably contemplated or likely in 1955, when the testator was 70, and his children were 38 and 39." (*Id.*) The plaintiff may be correct that Charles did not plan to adopt children so late in his life. But the most reasonable interpretation of clause 5 in light of the surrounding clauses is that Charles included the clause out of an abundance of caution to ensure that, in the event he did somehow have issue living in the event Robert and Janet were to die childless, those issue would have priority to his estate over charitable beneficiaries.

to those issue *at Janet's death*. Thus Charles expressed an intent that, if Janet were to survive Robert, nothing should happen to the corpus of Robert's trust until Janet dies; only at that time should the disposition of those funds be determined. While clause 4 never went into effect (because Janet never produced issue), the structure of clause 4 reveals Charles's intent that the determination of whether Janet produced issue should be made at the time of her death, not at the time of Robert's death.

Third, clause 3 provides further evidence that "at such time" in clause 5 refers to the death of the last child to die. Clause 3 instructs that upon C1's death (assuming both children have survived the parents), if C1 dies childless, the surviving child would receive the net income from the corpus of C1's trust. Under the plaintiff's proposed construction, because C2 would receive the corpus of C1's trust upon C1's death, clause 3 would become surplusage; there would be little reason to specifically grant C2 a right to the income from C1's trust if C2 would also immediately be entitled to the entire corpus of that trust. On the other hand, under the defendants' interpretation, clause 3 provided specific instructions for the period of time after Robert's death and before Janet's death (or vice versa).

Fourth, under the plaintiff's interpretation, Janet would receive the corpus of Robert's trusts, but would never under any circumstances receive the corpus of her own trusts. There is no expressed intent that Janet should receive the corpus of a trust created for Robert's benefit, but should never receive the corpus of the trust created for her own benefit. This is further evidence that Charles never intended the corpus of Robert's trust to pass to Janet upon Robert's death.

Fifth, there is no evidence that Charles intended to favor C2's issue living at the time of C1's death over C2's issue born (or adopted) after C1's death. An essential premise of the

11

plaintiff's argument is that the class of C2's issue, to which clause 4 grants a remainder in the corpus of C1's trust, would be fixed at the time of C1's death. (*See* Pl.'s Opp'n at 11.) This premise contradicts Charles's intent as expressed in clauses 2 and 4. Those clauses instruct that whenever the corpus of one of the trusts would be distributed to his grandchildren (if any), it should be distributed "<u>per</u> <u>stirpes</u>," that is, equally among the grandchildren entitled to the funds.[6] Under the plaintiff's interpretation, if Janet had had one child before Robert died and one (or or more) after he died, her eldest child would have an absolute right to the corpus of Robert's trust while all subsequent children would have no right to the corpus at all. Moreover, because clause 4 specifically instructs that the distribution should occur at C2's death, Janet's eldest child would not take the corpus until Janet died, even though his or her younger siblings would be living at that time. Absent an expressed intent to treat such issue within particular classes of issue unequally, the court will not adopt a construction that does so.

Sixth, the defendants' interpretation is consistent with an intent to create a generation-skipping trust to avoid estate taxes. Article 4 creates trusts that grant a life estate in the net income to the testator's wife (generation 1) and then grant a life estate to his children (generation 2) and then grant the corpus to his children's children (generation 3), if any exist, thereby relieving generation 2 of estate tax burdens. As the parties agree, at the time the will was executed, federal estate tax law permitted properly designed estate plans to skip a generation of estate taxes. (*See* Charitable Beneficiaries' Mem. at 19 (quoting Casner, *Estate Planning* 435

---

[6] Blacks' Law Dictionary defines "per stirpes" as "[p]roportionately divided between beneficiaries according to their deceased ancestor's share." *Black's Law Dictionary* (9th ed. 2009). Clause 2 grants a remainder interest in the corpus of C1's trust to C1's issue (e.g., C1's children, who would be Charles's grandchildren) "per stirpes." Accordingly, those grandchildren would share the corpus of C1's trust equally, and if they were to have their own children (who would be Charles's great-grandchildren) and C2's children were to die before C2, then Charles's great-grandchildren would share the corpus "per stirpes and not percapita," that is, proportionately according to their parents' share. Similarly, under clause 4, if C2 were to die with issue, C1's trust would pass to those issue "per stirpes." C2's children would take equally, and if they had children, those children (Charles's great-grandchildren) would take proportionately according to their parents' share.

12

(2d ed. 1961)) ("[I]f T in his will establishes a trust under which the income is to be paid to his wife for life and then to his son for life, and finally the corpus is to be distributed to the son's issue then surviving, no federal or state death taxes will be imposed on the property in the trust as the beneficial enjoyment passes from the wife to the son and from the son to his issue.").) In 1955 and 1956, the federal estate tax exemption was only $60,000. 26 U.S.C. § 2052 (1954); Darien B. Jacobson, Brian G. Raub, & Barry W. Johnson, *The Estate Tax: Ninety Years and Counting*, Statistics of Income Bulletin, Summer 2007, at 122 fig. D, *available at* http://www.irs.gov/pub/irs-soi/ninetyestate.pdf. As the plaintiff notes, Charles's estate was valued at roughly $725,000 when it was admitted to probate in 1956. It would be very likely—not "mere speculation," as the plaintiff argues—that a wealthy testator like Charles would seek, through a generation-skipping trust, to prevent his children from having to pay avoidable estate taxes. Under the defendants' construction, neither of Charles's children would be liable for estate taxes on his estate. Under the plaintiff's construction, in contrast, the corpus of C1's estate would be included in C2's gross estate and thus could be subject to estate taxes. Although the defendants have not cited, and the court has not found, a Maryland case on point, courts in other states have held that where there are two possible constructions of a will, courts should generally assume that the testator intended to minimize tax liability. *See, e.g.*, *Strauss v. van Beuren*, 378 A.2d 1057, 1059 (R.I. 1977) ("That there would be such a saving [in terms of tax liability from one possible construction of a will] is, of course, significant regarding the presumed dispositive intent."); *Putnam v. Putnam*, 316 N.E.2d 729, 737 (Mass. 1974) ("It would be a rare case in which a conflict of terms or an ambiguity in a will should be resolved by attributing to the testator an intention which as a practical matter is likely to benefit the taxing authorities and no one else.").

Seventh, the will as drafted accomplished fairly straightforwardly what the defendants argue (and what this court agrees) was Charles's intention: If either Robert or Janet produces issue and the other does not, the corpus of the childless child's trust should go to those issue; if neither Robert nor Janet produces issue, and if Charles does not have any other lineal descendants living when both Robert and Janet are dead, then the corpus should go to his designated charities. In contrast, using clause 5, which states in general terms, "otherwise to my issue living at such time," would have been a round-about way to grant C2 the corpus of C1's trust upon C1's death if C2 were to not produce issue. A more natural way to achieve this objective would have been to provide after clause 4, for example, "but if, at the death of such child of mine, such other child of mine has not produced issue, to give, absolutely, the corpus of such part to the surviving child." Maryland courts have stated that in weighing two potential intentions on the part of a testator, the relative simplicity of the language of the will in carrying out one intention is evidence of that intent. *See McCurdy v. Safe Deposit & Trust Co. of Baltimore*, 57 A.2d 302, 306 (1948) (concluding that if one proposed construction "would have been much simpler and easier and a more natural way of making the bequest," courts should presume that that construction is what the testator intended). Thus the comparative simplicity of the language in carrying out the intention of the testator proposed by the defendants provides another reason for concluding that Janet did not acquire the corpus of Robert's trust upon his death.[7]

---

[7] The defendants also argue that their interpretation is supported by the presumption in Maryland law against constructions of wills under which a testator would have made the same person a life tenant and the sole remainderman in the same estate. *See Madden v. Mercantile-Safe Deposit and Trust Company*, 278 A.2d 55, 61 (1971); *McCurdy*, 57 A.2d at 306 ("[W]hile there may be a common sense basis for a good draftsman to make a life tenant also one of a class of remaindermen, there is no such basis for making such life tenant the *sole* remainderman. It may be done, and if that is clearly the intent of the testator it must be followed. But courts should be slow to give such a unique and fantastic interpretation of a will.") (emphasis in original). They also argue that the spendthrift clause (Article 9) supports their construction because it demonstrates that Charles did not want his children to have

14

For these reasons, the only interpretation of the will supported by Charles's expressed intent is that "at such time" in clause 5 refers to the time when his last surviving child would die. While the plaintiff offers other arguments in support of its proposed construction, those arguments are unpersuasive. The plaintiff argues that because the "general intent of the Will is to benefit the testator's own family" over contingent charitable beneficiaries, Charles intended the corpus to pass to Janet rather than to the designated charities. (Pl.'s Opp'n at 7-9.) While Charles certainly had that general intent, it does not follow that Charles wished the corpus of C1's trust to pass to C2 upon C1's death. Under the interpretation the court adopts here, the Austrian charities only would become entitled to the corpus of Robert's trusts if the bloodline ran out; the charities would only receive the funds if Robert and Janet died childless and if no other issue of Charles were living at the time of Janet's death. This interpretation furthers Charles's "general intent" to benefit his family over charities just as effectively as does the plaintiff's proposed interpretation. In other words, as the defendants aptly state, "Charles Austrian's acknowledged intent to favor family over charities in no way expresses an intent to allow his children to decide which non-family entities should receive the remainder of his estate in the event that his children died without issue." (Defs.' Reply at 13.) Indeed, the simplest and most straightforward way Charles could have expressed such an intent would be to grant Robert or Janet a power of appointment, which he did not do.

The plaintiff also argues that the phrase "at such time" should retain the same meaning throughout Article 4, and because the phrase in clauses 2 and 4 indisputably refer to C1's death, the phrase in clause 5 should also be interpreted as referring to C1's death. The plaintiff is correct that "[w]here a word is used more than once, it is presumed to be used always in the same

---

the power to assign their interest, and permitting Janet to take the corpus upon Robert's death would contravene this intent. Because the court finds for the defendants on other grounds, it need not address these alternative arguments.

sense unless a contrary intention appears by the context." *McElroy v. Mercantile-Safe Deposit & Trust Co.*, 182 A.2d 775, 779 (1962). But here, for the reasons discussed above, there is substantial evidence that Charles intended the phrase in clause 5 to refer to the death of his second child to die, notwithstanding the fact that the phrase refers to a different moment in time in clauses 2 and 4. Thus a "contrary intention appears by the context" to demonstrate that the term was not intended to carry the same meaning throughout the will.

In addition, the plaintiff argues that because the Austrian will contains a "latent ambiguity," the court should deny the motion to dismiss. In support of its argument, the plaintiff cites *Monmonier v. Monmonier*, 266 A.2d 17, 19 (1970), which states that under Maryland law, a will contains a "latent ambiguity" if "the words of the instrument are apparently definite and specific, but are susceptible of application with equal certainty to each of several subjects or objects." *Id.* at 19 (citing Miller, Construction of Wills 122 (1927)). Where such an ambiguity exists, it may be resolved by extrinsic evidence. *Id.* For the reasons stated above, however, the only interpretation of the Austrian will supported by Charles's expressed intent is that the class of Charles's "issue living at such time" was fixed at the time of Janet's death, not Robert's death. Thus the disputed term here is not susceptible to two interpretations "with equal certainty" and accordingly there is no "latent ambiguity." Indeed, this is precisely the conclusion the court reached in *Monmonier*, the case cited by the plaintiff. There, the will at issue granted certain property to a "John Carroll Monmonier." *Id.* at 18. Two family members, who were both known by similar names, argued that they were each the person referred to in the will. *Id.* Despite this dispute over a crucial term, the court found that there was no "latent ambiguity" because the language of the will supported one alleged devisee's interpretation more strongly than the other's; thus, "parol evidence to show intent was inadmissible." *Id.* at 19-20.

Finally, the plaintiff argues that its construction is bolstered by the presumption in Maryland law for early vesting of estates, because "[w]hen Robert died, the class of potential remainderm[en] closed." (*See* Pl.'s Opp'n at 15-16.) This argument, however, assumes that the class of Charles's "issue living at such time" under clause 5 was fixed at the time of Robert's death. For the reasons discussed above, the class of Charles's "issue" in clause 5 did not close at Robert's death; if Janet produced issue after Robert's death (via adoption or otherwise), additional members would become part of the class. If the class had closed at Robert's death, and if Janet's right to the corpus of Robert's trust were interpreted as a remainder interest, then the presumption for early vesting could have become relevant to whether Janet's life estate would merge with her remainder. Because the class did not close at that time, however, the presumption for early vesting is irrelevant.

For these reasons, when Robert died, Janet received only a life estate in the corpus of Robert's trusts. When Janet died, she had not produced issue, and Charles had no other living issue. Thus, in accordance with clause 6 of Article 4(D), the corpus of Robert's trusts passed to the charitable beneficiaries designated by Charles Austrian: Sinai Hospital, Johns Hopkins Hospital, Johns Hopkins University, and the Peabody Institute.

## **CONCLUSION**

For the foregoing reasons, there is no basis to award the plaintiff the declaratory relief it seeks.[8] Moreover, because the text of the Austrian will is undisputed and the result the court reaches here is clear from reading the will, there is no need for discovery or expert reports, as the plaintiff requests. (*See* Pl.'s Opp'n at 6.) Finally, although the plaintiff argues that it "could file in good faith an Amended Complaint" (*id.* at 1 n.1), nothing it proffers or attaches to its

---

[8] Put another way, the defendants are entitled to a declaratory judgment that their interpretation is correct and that Sinai Hospital, Johns Hopkins Hospital, Johns Hopkins University, and the Peabody Institute are entitled to receive the corpus of the accounts that were held in trust for the benefit of Robert Austrian.

17

opposition memorandum would support granting leave to amend. Accordingly, the defendants' motions to dismiss will be granted, with prejudice, by separate Order.

Jan. 24, 2011 /s/
Date Catherine C. Blake
United States District Judge